# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
June 26, 2012 Session

## STATE OF TENNESSEE v. MARK TAKASHI

### Direct Appeal from the Criminal Court for Knox County
No. 83108A     Bob R. McGee, Judge

### No. E2010-01818-CCA-R3-CD - Filed September 27, 2012

A Knox County Criminal Court Jury convicted the appellant, Mark Takashi, of aggravated child abuse and aggravated child neglect, Class A felonies. The trial court merged the convictions, and the appellant received a twenty-five-year sentence to be served at 100%. On appeal, the appellant contends that the trial court erred by allowing him to represent himself at trial and that his sentence is excessive. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Gerald L. Gulley, Jr., (on appeal) and Mitchell T. Harper (at trial), Knoxville, Tennessee, for the appellant, Mark Takashi.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and James D. Holley, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

The appellant does not contest the sufficiency of the evidence. Taken in the light most favorable to the State, the evidence at trial revealed that the victim, the appellant's biological son, was born on August 21, 2005. The appellant, the victim, and the victim's mother, Sue Ann Lowe, lived in an apartment on Vermont Avenue in Knoxville. The appellant was

unemployed and responsible for the victim's care during the day while Lowe worked. On the morning of September 23, 2005, Lowe took the victim to Food City to buy diapers. Afterward, she and the victim visited her aunt and returned home. Lowe went to work that afternoon, leaving the one-month-old victim with the appellant.

About 7:30 p.m., Officer Brian Evans and Sergeant Mark Fortner of the Knoxville Police Department were dispatched to the appellant's apartment to accompany a Department of Children's Services (DCS) worker for a welfare check on the victim. They knocked on the door, the appellant answered, and they told the appellant why they were there. The appellant seemed annoyed but led them upstairs to a bedroom. A mattress was on the floor, and the victim was lying on the mattress. Another man, Brian White, was playing video games in the bedroom. Officer Evans described the victim as lifeless and "grayish." He thought the victim was dead, knelt by the mattress, and saw the victim's chest rise slightly. The appellant picked up the victim and told him to wake up, but the victim made no response. The appellant put the victim back on the mattress and told the officers that the victim was sleeping. Officer Evans picked up the victim and rubbed the bottom of his foot. The victim moved a toe, so Officer Evans knew he was alive. The officer called for an ambulance and carried the victim outside to wait for emergency medical technicians. The ambulance transported the victim to Children's Hospital.

At trial, Lowe testified that the victim was white when he was born, which caused the appellant, an African-American, to have doubts about the victim's paternity. The appellant would become agitated when the victim cried, got hungry, or had a dirty diaper. When the victim was just one week old, the appellant spanked him and told him, "'Shut up, little bastard. Stop crying.'" One time, the appellant put his hand over the victim's mouth when the victim would not stop crying. Lowe said that the appellant also "slammed" the victim onto the bed a couple of times, that she saw the appellant "toss" the victim, and that the appellant grabbed the victim by his feet and lifted him off the bed. On September 20, 2005, Lowe saw bruises along the victim's spine. She asked the appellant what happened to the victim, but he would not tell her. That night, the victim started crying, and the appellant used his fist to punch the victim in the victim's spine. Lowe said that one or two days before the victim was taken to the hospital, he "got on the appellant's nerves," so the appellant picked him up and tried to pull his neck from his body. Lowe likened the appellant's actions to wringing a chicken's neck. The victim had a red spot on his eye and began favoring his right side. On September 23, the victim was drifting in and out of consciousness. He was removed from the home that evening and taken to a hospital. Lowe said that she pled guilty to aggravated assault for failing to protect the victim from the appellant and that she received a six-year sentence.

Dr. Marymer Perales, a child abuse pediatrician, testified that she examined the victim

in the intensive care unit of Children's Hospital on September 24, 2005. The victim was wearing a neck brace, had a tube in his nose, and was sedated. He had been intubated in the emergency room the previous day due to seizures. Dr. Perales saw a bruise on the right side of the victim's chest. The victim's liver enzymes were elevated, causing Dr. Perales to be concerned about his liver and possible abdominal trauma. The victim experienced bleeding between the right side of his skull and brain and swelling on both sides of his brain. Dr. Perales said he had a rare fracture known as a "hangman's fracture" in his neck near the base of his skull. He also had a fracture in the eleventh rib on his left side and several rib fractures on his right side. Dr. Perales said the rib fractures on the right side had "callous formation," meaning they were more than ten to fourteen days old. Dr. Perales concluded that the victim's injuries were not accidental.

Suzanne Keck, a DCS investigator, testified that she visited the victim three weeks before the appellant's trial and that the victim was living in a home with "a mother and father caregiver." He received twenty-four-hour medical care in the home from nurses. The victim took multiple medications, including seizure medications. The victim had two to three seizures per day, and he cried and arched his back during the seizures. The victim had a continuous feeding tube in his stomach, received breathing therapy to prevent congestion in his lungs, and had crying spells that lasted for hours. The victim had scoliosis, vision problems, and braces on his feet. His fists were always clenched, and his face contorted randomly. Keck said the victim's greatest challenges were to be free from pain and seizures. The victim was not potty trained and could not walk, talk, or feed himself.

The appellant had been charged with aggravated child abuse and aggravated child neglect. The State made an election of offenses reflecting that the aggravated child abuse was based on the alleged incident in which the appellant held the victim by his throat and twisted his head. The jury convicted the appellant of both offenses. After a sentencing hearing, the trial court merged the aggravated child neglect conviction into the aggravated child abuse conviction and sentenced the appellant to twenty-five years to be served at 100%.

## II.  Analysis

### A.  Self-Representation

The appellant contends that the trial court erred by allowing him to represent himself at trial. He claims that the trial court did not question him adequately pursuant to Tennessee Rule of Criminal Procedure 44 in order to ensure that he knowingly and intelligently waived his right to counsel. The State argues that the trial court properly questioned the appellant and ascertained that he could represent himself at trial. We agree with the State.

The United States Constitution and the Tennessee Constitution guarantee an indigent defendant the right to be represented by appointed counsel during a criminal trial. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Likewise, "[j]ust as there is the right to the assistance of counsel at trial, there is the alternative right to self-representation." State v. Gillespie, 898 S.W.2d 738, 740 (Tenn. Crim. App. 1994); see also Faretta v. California, 422 U.S. 806, 819-20 (1975); State v. Small, 988 S.W.2d 671, 673 (Tenn. 1999). "The right to represent oneself, however, should be granted only after a determination by the trial court that the defendant is both knowingly and intelligently waiving the valuable right to assistance of counsel." Small, 988 S.W.2d at 673.

There are three essential prerequisites to activating the right of self-representation. First, the right to proceed pro se must be timely asserted. State v. Herrod, 754 S.W.2d 627, 629 (Tenn. Crim. App. 1988). Second, the defendant's request to proceed pro se must be clearly and unequivocally made. Id. at 630. Finally, the "accused must knowingly and intelligently waive the right to the assistance of counsel." Id. Additionally, Rule 44(b)(2) of the Tennessee Rules of Criminal Procedure provides that indigent defendants shall execute a written waiver of counsel. On appeal, the appellant contends that his waiver of the right to counsel was not intelligent because the trial court failed to inquire into his knowledge of possible defenses to the charges and circumstances in mitigation.

Initially, we note that a written waiver of the appellant's right to counsel was filed on January 30, 2008, and is in the appellate record. Also, our review of the appellate record reflects that the trial court inquired into the appellant's desire for self-representation twice.[1] During the first inquiry, which also occurred on January 30, 2008, the trial court informed the appellant that he had a constitutional right to be represented by a lawyer but that it was his decision whether to be represented by a lawyer. The trial court questioned the appellant, advised him to proceed with counsel, and asked if he still desired to represent himself. The appellant said he did not want to be represented "by an attorney, counsel in any form, shape or fashion." The trial court ruled that the appellant had waived his right to counsel and scheduled his trial for July 14, 2008, in order to give him time to file motions and prepare his case. The second inquiry, which occurred on April 15, 2010, was very similar to the first inquiry. The appellant maintained that he wanted to waive his right to counsel. The trial court again held that the appellant had waived his right to counsel and scheduled his trial for August 16, 2010. On July 28, 2010, the trial court appointed an attorney as the appellant's co-counsel.

---

[1]The trial judge who presided over the first inquiry for self-representation did not preside over the second inquiry or the appellant's trial.

We must determine whether the appellant knowingly and intelligently waived his right to counsel. Before a trial court accepts a defendant's waiver of counsel, the court must "advise the accused in open court of the right to the aid of counsel at every stage of the proceedings . . . and . . . determine whether there has been a competent and intelligent waiver of such right by inquiring into the background, experience, and conduct of the accused, and other appropriate matters." Tenn. R. Crim. P. 44(b)(1)(A), (B). In order to determine the knowing nature of the defendant's waiver, this court has suggested that trial courts follow the guideline questions contained in 1 Bench Book for United States District Judges 1.02-2 to -5 (3d ed. 1986). Smith v. State, 987 S.W.2d 871, 875 & appendix (Tenn. Crim. App. 1998) (quoting the suggested line of questioning from the Bench Book). Additionally, the United States Supreme Court has instructed as follows:

> "[A] judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered."

State v. Northington, 667 S.W.2d 57, 60 (Tenn. 1984) (quoting Von Moltke v. Gillies, 332 U.S. 708, 723-24 (1948)).

We conclude that the trial court in this case substantially complied with the suggested format in the federal guidelines. During the first inquiry into the appellant's desire for self-representation, the trial court informed him that if he represented himself, no one, including the court, could help him. The court asked the appellant if he was familiar with the Tennessee Rules of Evidence and Criminal Procedure and informed him that he would have to know the rules and how to select a jury. The trial court asked the appellant about his education, and the appellant said he had obtained his GED and taken some college classes. The trial court asked if he had ever studied the law or represented himself, and the appellant said no. The trial court informed him of the charges and possible punishment. The court asked if he realized that he could be ordered to serve the sentences in their entirety and consecutively

and told him that he would have to ask non-leading questions and learn how to cross-examine witnesses. The appellant said he understood. The court advised against self-representation, stating that "if I was sitting where you are . . . I wouldn't be without a lawyer, and I'm serious; I really wouldn't." The court repeatedly cautioned the appellant about representing himself and asked if he wanted to proceed without counsel. The appellant said yes.

During the second inquiry, the trial court informed the appellant about the charges and possible range of punishment and that it could not advise him about his case. The trial court asked if he was familiar with the Tennessee Rules of Evidence and Criminal Procedure and stated that he would have to abide by the rules. The trial court informed him that if he decided to testify, he would have to ask himself questions and could not "just take the stand and tell your story." The trial court told the appellant that "in my opinion you would be far better defended by a criminal lawyer than you can be by yourself. I think it is unwise of you to try to represent yourself." The court asked if he still wanted to represent himself, and the appellant said yes.

Both lines of questioning substantially complied with the line of questioning quoted from the guidelines for federal judges. Although the trial court did not ask the appellant during either inquiry about defenses or mitigating circumstances, the court engaged in lengthy colloquies with him about self-representation. It also urged him to have counsel and repeatedly asked if he wanted to waive his right to a lawyer. The appellant said yes every time. "Although not asking the exact litany of questions suggested, this failure does not necessarily preclude a constitutionally valid waiver." State v. Terrance G. Motley, No. W2002-02079-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 990, at *13 (Jackson, Nov. 14, 2003). We conclude that the appellant knowingly and intelligently waived the right to the assistance of counsel at trial.

B. Excessive Sentence

Next, the appellant contends that his twenty-five-year sentence is excessive because the trial court misapplied an enhancement factor and failed to consider his potential for rehabilitation or treatment. The appellant also contends that comparable child abuse cases suggest a lower sentence is appropriate. The State argues that the appellant's sentence is not excessive. We agree with the State.

The appellant was represented by counsel at the sentencing hearing, and neither the State nor the defense presented any witnesses. The appellant addressed the trial court, stating that no one ever expressed any concerns to him about the victim's health or safety and that Lowe "turned out [to be] a liar." The appellant asked that the trial court sentence him to fifteen years.

According to the appellant's presence report, the then thirty-two-year-old appellant dropped out of high school in the tenth grade. In the report, he stated that he obtained his GED and that he attended a computer repair class but did not complete the course. The appellant described his mental health as "excellent" but described his physical health as "fair" due to epidural lipomatosis, which caused pain in his lower back. In the report, the appellant denied using any alcohol or drugs and claimed he had worked for National Linen, Dynamic Security, Long John Silver's, Pizza Hut, Security Engineering, and Shoney's. The report does not show that the appellant has any criminal history.

The trial court noted that the range of punishment for aggravated child abuse, a Class A felony, was fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1). The trial court applied enhancement factors (4), that the victim "was particularly vulnerable because of age"; (5), that the defendant treated the victim with exceptional cruelty during the commission of the offense; (6), that the personal injuries inflicted upon the victim were particularly great; and (10), that the defendant "had no hesitation about committing a crime when the risk to human life was high." Tenn Code Ann. § 40-35-114(4), (5), (6), and (10). The trial court noted that it had considered sentencing in other aggravated child abuse cases. The trial court stated that the appellant had inflicted "horrific violence on a newborn baby over a period of two weeks" and that the victim, five years old at the time of the sentencing hearing, "lives a life of intense physical pain and suffering and intense emotional sorrow." The trial court applied no mitigating factors. The court merged the aggravated child neglect conviction into the aggravated child abuse conviction and sentenced the appellant to twenty-five years in confinement.

Appellate review of the length, range, or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; State v. Carter, 254 S.W.3d 335, 343-44 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

First, the appellant contends that his sentence is excessive because the trial court misapplied enhancement factor (6), that the personal injuries inflicted upon the victim were particularly great, because serious bodily injury is an essential element of aggravated child abuse. Tennessee Code Annotated section 40-35-114 specifically prohibits using enhancement factors that are elements of the offense, and our supreme court has held that "proof of serious bodily injury will always constitute proof of particularly great injury." State v. Jones, 883 S.W.2d 597, 602 (Tenn. 1994). The State concedes that the trial court misapplied this enhancement factor but argues that the remaining three enhancement factors justify the appellant's twenty-five-year sentence. We agree with the State.

Next, the appellant contends that his sentence is excessive because the trial court

failed to consider his potential for rehabilitation or treatment. Although the court did not specifically address this factor, the court noted during its pronouncement of sentence that the appellant began abusing the victim when the victim was only two weeks old, that the appellant inflicted "horrific violence" on the victim, that the appellant "sat playing video games" while the unresponsive victim lay only a few feet away, that the appellant made no attempt to follow Officer Evans when the officer carried the victim out of the apartment, and that the appellant never inquired about the victim's condition. In our view, the sentencing hearing transcript reflects that the trial court considered the appellant's potential for rehabilitation or treatment. We also note that the appellant has not accepted one iota of responsibility for the victim's condition, which reflects poorly on his potential for rehabilitation. State v. Zeolia, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996) (stating that a defendant's "credibility and willingness to accept responsibility for his crime are circumstances germane to his rehabilitation potential").

Finally, the appellant contends that his twenty-five-year sentence is excessive when compared to similar cases. The appellant has cited to several aggravated child abuse cases involving infants in which the defendants received sentences less than twenty-five years. However, none of the cited cases involved victims as young as the victim in this case. The appellant also argues that while the victim's injuries were "tragic," they did not result in the death of the child. However, the victim's death would have resulted in the appellant's facing a mandatory sentence of life in confinement. Instead, the victim survived the abuse and lives a life the trial court aptly described as "a life of intense physical pain and suffering and intense emotional sorrow." The appellant's sentence of twenty-five years is appropriate in this case.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE